# IN THE COURT OF APPEALS OF IOWA

No. 22-1368
Filed October 19, 2022

**IN THE INTEREST OF K.S. and E.S.,**
**Minor Children,**

**M.B., Mother,**
      Appellant.
_____

        Appeal from the Iowa District Court for Black Hawk County, David F. Staudt,

Judge.


        A mother appeals the termination of her parental rights to two children.

**AFFIRMED.**


        Andrew C. Abbott of Abbott Law Office, P.C., Waterloo, for appellant

mother.

        Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant

Attorney General, for appellee State.

        Kelly Smith of the Juvenile Public Defenders Office, Waterloo, attorney and

guardian ad litem for minor children.


        Considered by Ahlers, P.J., and Badding and Chicchelly, JJ.

**BADDING, Judge.**

This termination case brings us two young children—born in 2019 and 2021—whose mother could not meet their basic needs. The mother's parental rights were terminated under Iowa Code section 232.116(1)(h) (2022).[1] On appeal, she challenges the sufficiency of the evidence supporting the ground for termination, argues termination is not in the children's best interests because of her bond with them, and requests more time to work toward reunification. We affirm.

**I.      Background Facts and Proceedings**

In November 2020, a police officer conducted an animal welfare check at the home the mother and the oldest child shared with the child's maternal grandmother. The condition of the home was so poor—for the animal and the child—that the mother was charged with child endangerment and animal neglect.[2] An assessment completed by the Iowa Department of Human Services[3] was founded for denial of critical care. Voluntary services were put in place, and the condition of the home improved. The younger child was born in January 2021, and the voluntary case closed in late March.

Just a few weeks later, in April, the department received reports that the mother was not meeting the younger child's medical needs and the poor condition of the home created safety risks for the older child. Family-preservation services

---

[1] The father consented to termination and does not appeal.
[2] She ultimately received deferred judgments on these charges.
[3] The department has since merged with the Iowa Department of Public Health, thus culminating in the Iowa Department of Health and Human Services. *See In re D.B.*, No. 22-0979, 2022 WL 3906768, at *1 n.3 (Iowa Ct. App. Aug. 21, 2022).

were put into place, and the condition of the home again improved. Yet, concerns remained for the younger child, who was born with Hirschsprung's Disease,[4] about his lack of weight and severe diaper dermatitis. Despite frequent direction from the child's medical team and in-home nursing assistance, the child was admitted to the hospital in mid-April. During his stay, the child gained weight and his dermatitis cleared up. The medical team opined the mother's "lack of care" led to the child's "poor weight gain and bleeding ulcers . . . on his diaper area." When he was ready to be discharged, the team expressed concern about returning the child to the mother's care.

The department accordingly sought and obtained an order for temporary removal of the younger child in late April. Child-in-need-of-assistance petitions followed as to both children, though the oldest was allowed to remain in the mother's care. Out of the seventeen supervised visits the mother was first offered with the younger child, she attended only two. Throughout June, social workers were concerned about the mother's care of the older child, noting "that most of [the child's] time in her mother's care is in her pack and play." Toward the end of that month, the mother sent the older child to stay with a relative. Once there, the child was seen by a nurse practitioner, who expressed "concerns with her developmental delays due to the environment she was in." The child also had high lead levels and dental problems, which appeared to be from the child being "given large amounts of pop and candy." These concerns led to the older child's removal

---

[4] This is a lifelong condition affecting the nerves in the child's bowels and intestines that, according to the record, will improve somewhat as the child gets older. The disease mandates constant and close monitoring of the child's health.

from the mother's care, and both children were adjudicated as in need of assistance in July.

By September, the mother began parenting education through SafeCare. An evaluation recommended that she participate in services for co-occurring disorders with an emphasis on mental health. The mother did not engage in those services, and she remained inconsistent in attending interactions with the children. She also failed to appear for any drug testing, which was requested because of historical concerns for abuse of methamphetamine, marijuana, and alcohol.

The mother's inconsistency with visits continued into December. Of the thirty visits offered until then, she had attended only ten. And even though she was informed of the younger child's medical appointments, she did not attend any. While the mother graduated from the SafeCare program, "there remain[ed] a great deal of concerns with her parenting ability" and the safety of her home. As a result, the department's case manager recommended that the mother participate in more extensive one-on-one parenting education, but she failed to do so. A court-appointed special advocate visited the home in early December, and observed the "bathroom door was unable to be opened fully due to the items blocking it, piles of clothes throughout the home, the litter box remain[ed] in the kitchen full of feces, the kitchen sink did not drain and there were dishes with food in the sink."

In January 2022, the department recommended termination proceedings due to the mother's lack of progress and motivation to regain custody of the children. In its February permanency order, the court agreed and ordered the State to file termination petitions. The State did so about a week later.

The mother gave birth to a third child in March. She restarted therapy and, with help from her mother-in-law, cleaned the home enough so that visits could be held there for the first time in the case. The cleanliness and safety of the home remained a serious concern, with the case manager describing its condition as "borderline." The mother continued to have little involvement with the younger child's medical appointments with specialists, failing to even show up to the hospital in February 2022 when he was admitted. Of the one appointment the mother did attend with the foster parents, the physician was concerned the child was going to fall off the table when the mother was changing his diaper. The foster parents reported the mother could not provide basic information about the child, such as his date of birth, to medical providers.

A termination hearing was held in early June. By that point, the mother had not attended therapy since April. And the condition of her home had deteriorated yet again, with the court-appointed special advocate noting the kitchen had "garbage sitting out, dishes and pots and pans piled high in the sink, and a distinct odor. There was more clutter on table tops. The front porch [has] a large hole in the top of the steps" that the mother stepped through and injured herself.

The caseworker testified termination was warranted because the

> concerns that led to the removal have remained in place throughout the case. [The younger child] was removed based on her inability to meet his medical needs and throughout the case she has not even attempted to learn anything regarding his medical needs. She has brushed his medical needs off as something that will just kind of go away when he turns three. There remains a great deal of concerns with her parenting for both of the children. Her housing remains a concern. She has throughout the case appeared very unmotivated to be a full-time parent to these children.

When asked about whether the mother should be given more time, the worker added:

> She has been given a year to make any progress in meeting the children's needs, and it was not until the birth of her daughter with her new husband that she even engaged minimally in services. Prior to the birth of her daughter, she was not attending visits. She was—visits were not important to her, seeing her kids [was] not important, and she still is not consistent with the services to address her needs, the safety concerns.

While the worker agreed the mother began attending visits more often after the termination petitions were filed, she said the mother still needs frequent prompting during visits to perform basic parenting tasks.

In its ruling, the juvenile court terminated the mother's parental rights under Iowa Code section 232.116(1)(h), finding the children could not be returned to the mother's care, additional time would not make any significant difference, and no permissive exception to termination applied. The mother appeals.

## II. Analysis

We apply a three-step analysis in conducting our de novo review of terminations of parental rights, asking whether (1) a statutory ground for termination is satisfied, (2) the children's best interests are served by termination, and (3) a statutory exception applies and should be exercised to preclude termination. *See In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022) (noting that in conducting our de novo review, we "give weight to the [court's] factual findings but are not bound by them"); *see also* Iowa Code § 232.116(1)–(3). If all three steps support termination, the court considers the ancillary issues raised by the parent, such as whether additional time should be granted. *See* Iowa Code § 232.117(5); *see also id.* § 232.104(2)(b).

**A.     Ground for Termination**

For her challenge to the statutory ground for termination, the mother only contests the State's proof of the final element of Iowa Code section 232.116(1)(h)—that the children could not be returned to her care at the time of the termination hearing.  *See id.* § 232.116(1)(h)(4); *see In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (interpreting the statutory language "at the present time" to mean "at the time of the termination hearing").  Painting a rosy picture of her progress, the mother submits the children could have been returned to her care because she was regularly attending visits, was tending to her mental health, had returned negative drug screens, completed parenting education, and "made progress in being able to handle the upkeep of the family home with the help of her husband and his family."

The mother fails to recognize she showed no motivation to regain custody until well after the termination petitions were filed, which is too late.  *See In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) ("A parent cannot wait until the eve of termination, after the statutory time periods for reunification have expired, to begin to express an interest in parenting.").  While she did begin attending visits more regularly, she still required frequent prompting on routine parenting tasks, like diaper changes, despite her completion of a parenting program.  The mother had not meaningfully participated in mental-health treatment and, though she had some negative drug screens, she failed to show for multiple tests.  In any event, substance abuse was not the driving factor in this case.  It was instead, as the case manager testified, the mother's "parenting, her mental health, her lack of

meeting the children's needs, the condition of the home." After more than a year of services, all of those concerns remained.

All told, the mother did not progress to a point that she could safely provide unsupervised care of these children. "Because of the mother's inability to provide minimally adequate care, she was not in a situation to progress beyond fully supervised visits and, by extension, could not resume care of the children." *In re A.S.*, No. 22-0894, 2022 WL 2826051, at *3 (Iowa Ct. App. July 20, 2022). We agree with the juvenile court that the State met its burden to prove this ground for termination.

### B.      Best Interests and Statutory Exception

The mother next argues both that termination is contrary to the children's best interests and would be detrimental to them "particularly due to the closeness of the parent child relationship considered in section 232.116(3)(c)."

Properly considering these arguments step by step and first addressing the children's best interests, *see In re A.S.*, 906 N.W.2d 467, 472–73 (Iowa 2011) (discussing three-step termination framework), the court "give[s] primary consideration to the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren]." Iowa Code § 232.116(2). The defining elements of a child's best interests are safety and need for a permanent home. *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011).

These young children have been out of the mother's care for more than a year, and they are flourishing. In a letter to the court, the foster parents reported that when the older child

first arrived, [she] was very shy and quiet. We struggled to get her to speak more than single words or speak instead of gesture for what she wanted. After a lot of work, she is increasingly verbal. She learns new words daily, she is forming more complex sentences, and she has learned to enunciate when she isn't understood at first. She talks to us from the moment she wakes up to the moment she goes to bed.

As for the younger child, the foster parents said his "smile lights up a room. . . . He has a wonderful temperament, but has become comfortable enough with us to express his needs through anger and sadness as well." The children are integrated with this pre-adoptive family, who have provided for their needs and will give them an opportunity for stability and permanency. *See* Iowa Code § 232.116(2)(b). In contrast, the mother has shown little motivation to regain custody of the children, as demonstrated most obviously by her inconsistent participation in visits and medical appointments. On this record, we agree termination is in the children's best interests.

With respect to the permissive exception cited by the mother, Iowa Code section 232.116(3)(c) authorizes the court to forgo termination when it "would be detrimental to the child[ren] . . . due to the closeness of the parent-child relationship." *See In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016) (noting the application of a statutory exception to termination, if one exists, is "permissive, not mandatory" (citation omitted)). "[T]he parent resisting termination bears the burden to establish an exception." *A.S.*, 906 N.W.2d at 476.

The mother contends "[t]here is a significant bond between" her and the children, but the record shows the opposite. Neither child seeks out the mother for comfort, instead turning to the foster parents when the mother is present. The mother presented no evidence the children would suffer physical, mental, or

emotional detriment if her rights were terminated, and it is hard to imagine they would given their young ages and extended removal from the mother's care. We accordingly agree with the juvenile court that this exception does not apply.

### C.     Additional Time

Lastly, the mother requests that "an extension of permanency be granted." *See* Iowa Code §§ 232.117(5) (stating that if the juvenile court does not terminate parental rights, it may enter an order under section 232.104(2)(b)), .104(2)(b) (allowing the juvenile court to continue placement of a child for an additional six months). In order to obtain an extension, however, the mother must show "specific factors, conditions, or expected behavioral changes which [would] comprise the basis for the determination that the need for removal . . . will no longer exist at the end of" an extension of time. *See id.* § 232.104(2)(b). But her only argument on this point is that "with additional time [she] could ultimately have [the children] placed in her care." The lack of progress she made after more than a year of services shows that is not true. *See In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990) ("Given [the father's] past performance we are not convinced additional time or services will change him.").

**AFFIRMED.**